**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LeTip World Franchise LLC, | No. CV-24-00165-PHX-SMB |
| Plaintiff, | **TEMPORARY RESTRAINING ORDER** |
| v. | |
| Long Island Social Media Group LLC, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff LeTip World Franchise LLC's ("LeTip") Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7). On January 25, 2024, the Court issued an order to show cause as to why the injunctive relief requested by Plaintiff should not be granted. (Doc. 9.) Plaintiff served each and all Defendants on January 26, 2024. (*See* Docs. 10–14.) The Court held a Temporary Restraining Order ("TRO") hearing on January 31, 2024. The Court has considered the pleadings, arguments of counsel, and relevant case law and will grant Plaintiff's Motion for the reasons discussed below.

**I.    BACKGROUND**

LeTip is a privately-owned business leads organization. (Doc. 7 at 2.) The organization is made up of thousands of members who engage in professional development and networking with one another. (*Id.*) LeTip is divided into regional chapters. (*Id.*) There are currently over 250 chapters throughout the United States and Canada. (*Id.*) LeTip has developed proprietary system for the development and operation of these chapters. (*Id.* at 3.) Through their franchising entity, LeTip World Franchise, LLC, LeTip

franchises this system. (*Id.*) Their franchisees establish and administer the system within a defined territory. (*Id.*) The franchisees are then permitted to established chapters within its assigned territory, sell memberships to those chapters, and host membership meetings. (*Id.*)

### A. The Agreements

On April 10, 2020, LeTip and Long Island Social Media Group ("LISMG") entered into one of the aforementioned franchise agreements (the "Franchise Agreement"). (*Id.*) Per this agreement, LISMG was granted the right to operate a LeTip business within Suffolk County, New York for five years. (*Id.*) LISMG is comprised of Clifford Pfleger, Heather Plfleger (the "Pfleger Defendants"), and Saranto Calamas. (*Id.* at 4.)

To identify the source, origin, and sponsorship of LeTip and distinguish its events, LeTip and its franchisees use certain trademarks, service marks, trade names, logos, emblems, and indicia or origin (the "LeTip Marks"). (*Id.* at 3.) LeTip retains the exclusive right to use and license the LeTip Marks. (*Id.*) The Franchise Agreement grants LISMG a limited, non-exclusive and revocable license to use the LeTip Marks. (*Id.* at 4.) This license also extended to LeTip manuals, training, and other confidential and proprietary information in connection with the operation of LISMG's territory. (*Id.*)

Section 12 of the Franchise Agreement sets forth the operating standards for franchisees such as LISMG. (*Id.*) This section requires franchisees and owners to operate their LeTip business "in a manner that will promote the goodwill of the Marks" and remain in compliance with all standards and terms of the "Agreement and the Manual." (Doc. 1-1 at 11.) In full, Section 12.10 states:

> **Failure to Comply with Standards**. You acknowledge the importance of every one of our standards and operating procedures to the reputation and integrity of the System and the goodwill associated with the Marks. If we notify you of a failure to comply with our standards or operating procedures and you fail to correct the non-compliance within the period of time that we require, then, in addition to any other remedies available to us under this Agreement, we may impose a fine of up to $500 per violation for every 30 days that the violation remains uncured.

(*Id.*)

The Franchise Agreement also includes a provision governing the ownership and use of LeTip's intellectual property, found at Section 19.1. This section provides:

> **Ownership and Use of Intellectual Property**. You acknowledge that: (i) we are the sole and exclusive owner of the Intellectual Property and the goodwill associated with the Marks; (ii) your right to use the Intellectual Property is derived solely from this Agreement; and (iii) your right to use the Intellectual Property is limited to a license granted by us to operate your Business during the Term pursuant to, and only in compliance with, this Agreement, the Manual, and all applicable standards, specifications and operating procedures that we prescribe from time to time. You may not use any of the Intellectual Property in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized by us. Any unauthorized use of the Intellectual Property constitutes an infringement of our rights. You agree to comply with all provisions of the Manual governing your use of the Intellectual Property. This Agreement does not confer to you any goodwill, title or interest in any of the Intellectual Property.

(Doc. 1-1 at 16.)

Section 19.3 also limited LISMG's and the Pfleger Defendants' use of the LeTip Marks. It reads, in pertinent part:

> **Use of Marks**. You agree to use the Marks as the sole identification of your Business; provided, however that you must identify yourself as the independent owner of your Business in the manner that we prescribe. You may not use any Marks in any modified form or as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs or symbols (other than logos licensed to you by this Agreement). The Franchise Agreement also contains several non-compete provisions.

(*Id.*)

Section 22.2 provides for termination of the Franchise Agreement of these grounds, stating:

> **Termination By Us Without Cure Period**. We may, in our sole discretion, terminate this Agreement upon five (5) days' written notice, without

> opportunity to cure, for any of the following reasons, all of which constitute material events of default under this Agreement:
>
> (viii) *if you or an Owner commits an act that can reasonably be expected to adversely affect the reputation of the System or the goodwill with the Marks;*
>
> (xiv) *if you make an unauthorized use of the Intellectual Property*

(*Id.* at 19–20.)

The Franchise Agreement also contains a provision that does not allow a franchisee to operate a competitive business during or for a period of two years following termination of the agreement. Section 16.4 states:

> **<u>Unfair Competition After Term</u>**. During the Post-Term Restricted Period, you and your Owners agree not to engage in any Prohibited Activities. Notwithstanding the foregoing, you and your Owners may have an interest in a Competitive Business during the Post-Term Restricted Period as long as the Competitive Business is not located within, and does not hold meetings for members or business owners from any venue that is located within, the Restricted Territory. If you or an Owner engages in a Prohibited Activity during the Post-Term Restricted Period (other than having an interest in a Competitive Business that is permitted under this Section), then the Post-Term Restricted Period applicable to you or the non-compliant Owner, as applicable, shall be extended by the period of time during which you or the non-compliant Owner, as applicable, engaged in the Prohibited Activity.

(*Id.* at 13.)

Attachment A of the Franchise Agreement defines the terms relevant to reading Section 16.4:

> **a.** "***Post-Term Restricted Period***" means: "a period of two (2) years after the termination, expiration or Transfer of this Agreement; provided, however, that if a court of competent jurisdiction determines that the two-year Post-Term Restricted Period is too long to be enforceable, then the "Post-Term Restricted Period" means, with respect to you, a period of one (1) year after the termination, expiration or Transfer of this Agreement. "Post-Term Restricted Period" means, with respect to an Owner, a period of two (2) years after the earlier to occur of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the

      Entity that is the franchisee, as applicable; provided, however, that if a court of competent jurisdiction determines that the two-year Post-Term Restricted Period is too long to be enforceable, then the "Post-Term Restricted Period" means, with respect to an Owner, a period of one (1) year after the earlier to occur of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the Entity that is the franchisee, as applicable.

  **b.** "***Competitive Business***" means any business competitive with us (or competitive with any of our affiliates or our franchisees) that focuses on the facilitiation of the exchange of business leads between members or other participants.

  **c.** "***Restricted Territory***" means the geographic area within: (i) your Territory; and (ii) any territory operated by us, an affiliate of ours, or another franchisee as part of a LeTip business as of the Effective Date and that remains in operation or under construction during all or any part of the Post-Term Restricted Period; provided, however, that if a court of competent jurisdiction determines that the foregoing Restricted Territory is too broad to be enforceable, then the "Restricted Territory" means the geographic area within your Territory.

(*Id.* at 26–28.)

Per Section 16.4, LISMG specifically agreed to not "hold meetings for member or business owners from any venue that is located within the Restricted Territory" and agreed to the Restricted Territory pictured below:



(*Id.* at 29–30.) Concurrent with LeTip and LISMG's signing of the Franchise Agreement, Plaintiff, the Pfleger Defendants also executed a Franchise Owner Agreement. (Doc. 7 at 7.) Plaintiff asserts that this agreement personally bound the Pfleger Defendants to the Brand Protection Covenants in the Franchise Agreement, such as the post-termination restrictive covenant of Section 16.4.

The Franchise Owner Agreement also contains substantially the same post-termination restrictive covenant included in the Franchise Agreement. (*Id.*) The post-termination restrictive covenant in the Franchise Owner Agreement reads:

> **<u>Unfair Competition After Relationship</u>**. You agree not to unfairly compete with us during the Restricted Period by engaging in any Prohibited Activities; provided, however, that the Prohibited Activity relating to having an interest in a Competitive Business will only apply with respect to a Competitive Business that is located within, or holds meetings for members or business owners from any venue that is located within, the Restricted Territory. If you engage in any Prohibited Activities during the Restricted Period, then you agree that your Restricted Period will be extended by the period of time during which you were engaging in the prohibited activity.

(Doc. 1-1 at 33.) The Franchise Owner Agreement defines "Restricted Period" as follows:

> " . . . the two (2) year period after the earliest to occur of the following: (i) the termination or expiration of the Franchise Agreement; (ii) the date on which Franchisee assigns the Franchise Agreement to another person with respect to whom neither you nor your spouse holds any direct or indirect ownership interest; or (iii) the date on which you cease to be an owner of Franchisee or your spouse ceases to be an owner of Franchisee, as applicable; provided however, that if a court of competent jurisdiction determines that this period of time is too long to be enforceable, then the "Restricted Period" means the one (1) year period after the earliest to occur of the following: (i) the termination or expiration of the Franchise Agreement; (ii) the date on which Franchisee assigns the Franchise Agreement to another person with respect to whom neither you nor your spouse holds any direct or indirect ownership interest; or (iii) the date on which you cease to be an owner of Franchisee or your spouse ceases to be an owner of Franchisee, as applicable.

(*Id.* at 32.) The Franchise Owner Agreement defines "Prohibited Activities" as follows:

> (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in a Competitive Business (other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business); (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); and/or (iii) inducing any LeTip member of ours, our affiliate or of another franchisee to transfer their business to you or to any other person that is not then a franchisee of ours.

(*Id.*)

Moreover, the Franchise Owner Agreement also purportedly defines a "Competitive Business" as "any business competitive with us (or competitive with any of our affiliates or our franchisees) that focuses on the facilitation of the exchange of business leads between members or other participants." (*Id.*)  And lastly, with respect to disputes, Section 24 of the Franchise Agreement contains a forum selection clause, as follows:

> The parties agree to submit any claim, dispute or disagreement, including any matter pertaining to the validity, enforcement or interpretation of this Agreement or issues relating to the offer and sale of the franchise or the relationship between the parties (a "Dispute") to mediation before a mutually- agreeable mediator prior to litigation, unless the Dispute involves an alleged breach of Section 16 or Section 19. Any mediation shall take place in the county in which we maintain our principal place of business at the time the mediation begins (currently, Maricopa County, Arizona). If the Dispute is not successfully resolved by mediation within 30 days after either party makes a demand for mediation or the Dispute involves an alleged breach of Section 16 or Section 19, either party may file a lawsuit in any state or federal court of general jurisdiction in the county in which we maintain our principal place of business at the time the lawsuit is filed and we and you irrevocably submit to the jurisdiction of such courts and waive any objection either of us may have to either the jurisdiction or venue of such courts.

(*Id.* at 21.)  Plaintiff states that they brought these claims in this Court in accordance with this clause.  (Doc. 1 at 2–3.)

**B.  The Conduct**

In April 2023, LeTip discovered that Clifford Pfleger had affixed a LeTip Mark to

his boat. (Doc. 7 at 8.) However, he modified the mark by adding the word "just" directly above LeTip. (*Id.*) Plaintiff alleges that this "resulted in a phrase deliberately infused with vulgar and sexual innuendo." (*Id.*) Pfleger also posted a picture of the boat with the modified mark on social media. (Doc. 7-1 at 3–4 ¶ 17.) More importantly, Plaintiff alleges that this use of the LeTip Mark breached the Franchise Agreement, the license to use the LeTip Marks, and the "LeTip Identity Guidelines" given to all franchisees and chapters. (Doc. 7 at 8.) Plaintiff contends that by modifying the LeTip Mark in this manner, Pfleger "negatively affected the goodwill associated with the marks." (*Id.*) The boat can be seen in the image below:



In response, two LeTip executives met with Pfleger and demanded that he remove the LeTip mark from his boat. (Doc. 7 at 8.) They also gave him a letter from LeTip's trademark counsel, which also requested that he cease and desist publishing photographs of the boat on social media. (*Id.* at 8–9; Doc. 1-2.) The letter also threatened legal action and termination of the Franchise Agreement. (Doc. 7 at 8–9.) In response, Pfleger verbally agreed to remove the image from the boat. (*Id.* at 9.) However, Plaintiff contends Pfleger did not remove the mark from the boat. (*Id.*) Therefore, about a month after this meeting, LeTip's counsel sent LISMG a letter providing notice of their termination of the Franchise

Agreement pursuant to Section 22.2 without an opportunity to cure. (*Id.*; Doc. 1-3 at 1–5.)

Sometime in December 2023 or January 2024, Pfleger announced on LinkedIn that he was starting a new position as a Regional Director at BxB Professionals LLC ("BxB"). (Doc. 7 at 10.) BxB holds it itself out as business networking company that aims to "connect like-minded business individuals with the purpose of sharing success, through business leads and networking. Which will enable these individuals to grow personally, professionally, and profitably." (*Id.* at 11.) BxB's registered corporate address is allegedly the same address listed for LISMG and is also the address Defendant Calamas lists for his CPA license. (*Id.*)

BxB has allegedly scheduled a "launch party" on February 1, 2024, at a venue in Holtsville, New York. (*Id.*) Plaintiff states that this venue is the same one LeTip uses for their monthly meetings and alleges that BxB purposefully scheduled its launch party the day before a LeTip meeting to recruit LeTip members to BxB. (*Id.*) Plaintiff further alleges that BxB has been advertising this launch party on social media. (*Id.*)

Plaintiff filed a Complaint in this Court on January 23, 2024, and filed this request for a TRO the next day. (*See* Doc. 1, Doc. 7.) Plaintiff seeks a TRO enjoining Defendants from their alleged ongoing breaches of the Franchise Agreement. (Doc. 7 at 12.) At the hearing, Pfleger provided sworn testimony. When asked what would occur at the "launch party" he stated that they were "going to talk about business ideas, concepts, and it's really an open networking event." He further stated that attendees would be able to "leave behind a business card" so BxB could determine "whether or not they are a right fit for our group."

## II.   LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action. Fed. R. Civ. P. 65. The analysis for granting a TRO is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Cochran v. Rollins*, No. CV 07-1714-PHX-MHM (JRI), 2008 WL 3891578, at *1 (D. Ariz. Aug. 20, 2008). "A preliminary injunction is 'an

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted))); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A plaintiff seeking a preliminary injunction must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm without an injunction; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

## III. DISCUSSION

### A. Likelihood of Success on the Merits

Under this first element, Plaintiff argues that its post-termination restrictive covenants are narrowly tailored and enforceable. (Doc. 7 at 13.) Plaintiff further argues that these restrictive covenants were designed to prevent Defendants' precise behavior and are consistent with protecting a company's legitimate interest in its customer base from unfair competition and protecting trade secrets and confidential information. (*Id.*)

To be valid and enforceable under Arizona law, a post-termination restrictive covenant must: (1) be reasonable as to time and territory limitations; (2) not exceed what is reasonably necessary to protect the principal's legitimate business interests; (3) not unreasonably restrict the agent's rights; and (4) not contravene public policy. *Bed Mart, Inc. v. Kelley*, 45 P.3d 1219, 1221 (Ariz. Ct. App. 2002) (cleaned up); *Snelling & Snelling*,

*Inc. v. Dupay Enters., Inc.*, 609 P.2d 1062, 1064–65 (Ariz. Ct. App. 1980). Whether a restrictive covenant is reasonable is a question of law. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1280–81 (Ariz. 1999). "The burden is on the party wishing to enforce the covenant to demonstrate that the restraint is no greater than necessary to protect the employer's legitimate interest." *Id.* at 1286. Moreover, territorial restrictions should be limited to the territory in which the franchisor has established customer contacts and good will. *Snelling*, 609 P.2d at 1064.

Here, Plaintiff's restrictive covenants provide both duration and geographic limitations. (Doc. 1-1 at 13, 26–28.) Under the Franchise Agreement, Defendants are restricted from operating a competitive business during or for a period of two years following termination of the agreement. (*Id.*) This restriction, at a minimum, extends to Defendants' LeTip territory, Suffolk County, New York, also referred to as the Restricted Territory. (*Id.* at 29–30.) Arizona courts have addressed the reasonability of both types of restrictions. For instance, in *Snelling*, an Arizona court upheld a covenant not to compete within thirty-five miles of a designated franchise area for three years. 609 P.2d at 1064–65. The court, however, found that a different restriction prohibiting a party from establishing a business within thirty-five miles of *any* Snelling office was unreasonable. *Id.* at 1064. The court also found the restriction necessary to protect the goodwill of the franchisor's trademark within the franchise area. *See id.*

A similar conclusion was reached in *Fitness Together Franchise Corporation v. C.P. Body Design, Inc.*, No. CIV-09-02230-MHM, 2010 WL 11628010 (D. Ariz. Feb. 24, 2010), in which the court upheld a one-year restriction within an eight-mile area for a fitness franchisee. *Id.* at *8. The court reasoned that the restriction was narrowly tailored and balanced the franchisor's protectable interest in its customers and good will within the restricted area. *Id.* Further, in *First Ascent Ventures, Inc. v. DLC Dermacare, LLC*, No. CV-06-1794-PHX-JAT, 2006 WL 7285609 (D. Ariz. Oct. 25, 2006), the court upheld a restrictive covenant that prohibited any interest in a competitive business for three years after termination of the franchise agreement if the business was located either within a

franchise area or within 30 miles of another clinic within the franchise. *Id.* at *6. The court based its decision on the loss of good will, inability to establish a new franchise without competition from the new business, the loss of customer base, and intangible damage to the franchise system. *Id.*

Applying these cases to the similar facts here, the Court finds the post-termination restrictive covenants reasonable. Both the time and geographic limitations fall within the bounds of reasonability under Arizona law. First, two years is a sufficiently narrow window of time to protect Plaintiff's good will and customer relations within the Restricted Territory without impermissibly restraining Defendants' ability to pursue a new business venture. Moreover, this restriction properly serves to protect Plaintiff's interest in retaining customers that both parties are now seeking—business professionals who are interested in professional networking events.

The same analysis applies to the geographic restriction. Again, this restriction falls within the reasonability outlined in prior cases. Additionally, the restriction plainly serves to protect Plaintiff's established relationship with existing customers within the Restricted Territory. Plaintiff has customer contacts and good will in the Restricted Territory that it reasonably wishes to protect. Moreover, this covenant is properly restricted to the Restricted Territory. The Restricted Territory is a sufficiently small area that is directly tied to Defendants' former (and potentially current) business operations and, in turn, tied to Plaintiff's business. But like the court in *Snelling*, this Court also finds that extending this restriction to *any* other territory would be unreasonable. *See Snelling*, 609 P.2d at 1064. However, at the hearing, counsel for both parties agreed that the covenant, and in turn this TRO, will apply only to the Restricted Territory. Additionally, there is no indication that Defendants have developed any contacts in other territories. Accordingly, the Court finds both post-termination covenants reasonable.

In its Complaint, Plaintiff also alleges a claim for breach of contract and tortious interference with contractual relations. Under Arizona law, a claim for breach of contract has three elements: (1) the existence of a contract between the plaintiff and defendant; (2)

a breach of the contract by defendant; and (3) resulting damage to the plaintiff. *Frank Lloyd Wright Found. v. Kroeter*, 697 F. Supp. 2d 1118, 1125 (D. Ariz. 2010). Here, Plaintiff alleges that Defendants are breaching the Franchise Agreement and the Franchise Owner Agreement by directly competing against LeTip. (Doc. 1 at 11.) On the current record, Plaintiff has established these elements to a degree to show likelihood of success on the merits of the claim.

The same is true for the tortious interference claim. To establish this tort, a claimant must show: (1) a valid contract or business expectancy existed; (2) the interferer had knowledge of such business contracts or expectancy; (3) there was intentional interference causing a breach of the contract or business expectancy; and (4) resultant damages. *Neonatology Assocs. v. Phx. Perinatal Assocs. Inc.*, 164 P.3d 691, 693 (Ariz. Ct. App. 2007). This claim relates to Plaintiff's allegation that Defendants BxB and Calamas "are willfully and intentionally interfering with LeTip's business expectancies by causing LISMG and the Pfleger Defendants to breach the terms of the Franchise Agreement and the Franchise Owner Agreement." (Doc. 1 at 12.) Plaintiff also asserts that these Defendants are acting in a "spiteful manner that is intended to harm LeTip's reputation and goodwill" resulting in irreparable injury and damage to its "business practices, reputation, and relationships." (*Id.*) Like the breach of contract claim, Plaintiff has also established these elements at a level to show likelihood of success on the merits.

In sum, the Court finds that both post-termination restrictive covenants are reasonable, and that Plaintiff has shown a likelihood of success on the merits.

**B. Irreparable Harm**

Next, Plaintiff asserts that the alleged contractual breaches have caused, and will continue to cause, irreparable harm to their business. (Doc. 7 at 15.) Plaintiff also indicates that Section 16.8 of the Franchise Agreement that any violation of the terms of that Section will entitle them to injunctive relief. (*Id.*)

Irreparable harm is harm for which there is no adequate remedy at law, such as money damages. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

"The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance. Demonstrating irreparable harm is not an easy burden to fulfill." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (cleaned up); *see also Dalkita, Inc. v. Distilling Craft, LLC*, 356 F. Supp. 3d 1125, 1131 (D. Colo. 2018). However, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841.

Here, Defendants' creation of a new business venture in the same geographic territory seeking the same customers as Plaintiff is causing irreparable harm. As Pfleger's testimony showed, Defendants started a business that directly competes with LeTip, promoted the business, and scheduled a "launch party" to celebrate its launch and attract clients. These actions are likely to cause Plaintiff to lose current and prospective customers and good will. Additionally, in signing the Franchise Agreement, Defendants acknowledged that any breach of the covenants would cause irreparable harm, for which there is no adequate remedy at law. (*See* Doc. 1-1 at 14.) The only means of effectively enforcing the provisions is injunctive relief. *See Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006). Therefore, the Court finds there is a likelihood of irreparable harm if a temporary restraining order is not issued.

### C. Balance of Equities

Next, Plaintiff argues that the balance of equities tips in their favor due to the limited harm Defendants would suffer if enjoined. (Doc. 7 at 16.) "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'") (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.1980))).

The Court agrees with Plaintiff. Here, Defendants could potentially lose revenue for their new business venture if enjoined. However, this revenue would likely stem from a violation of the valid restrictive covenants. On the other side of the scale, Plaintiff will suffer harm to its business and good will in the Restricted Territory. Accordingly, the balance of equities weighs in favor of Plaintiff, and thereby in favor of granting the TRO.

### D. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "Courts have held that the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights." *Compass Bank*, 430 F. Supp. 2d at 983. Here, the public interest is served by enforcing the reasonable terms as written and agreed to by the parties. Therefore, public policy also weighs in favor of granting the TRO.

## IV. CONCLUSION

For the reasons discussed above,

**IT IS HEREBY ORDERED** granting, in part, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7).

**IT IS FURTHER ORDERED** that a Temporary Restraining Order is hereby entered against all Defendants effective January 31, 2024.

**IT IS FURTHER ORDERED** that Defendants, their owners, employees, agents, and all those in active concert or participation with them, are hereby restrained and enjoined, directly and indirectly, from engaging in any of the following activities: (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in any business defined as a "Competitive Business" in section 16.4 of the Franchise Agreement, (ii) diverting or attempting to divert any business from LeTip (or one of its affiliates or franchisees); and (iii) inducing any LeTip member, affiliate or

franchisee, to transfer their business to Defendants or to any other person or entity that is not a franchisee of LeTip, all within Defendants' former franchise territory, Suffolk County, New York.

**IT IS FURTHER ORDERED** that Defendants, their owners, employees, agents, and all those in active concert or participation with them, are also specifically restrained and enjoined, directly and indirectly, from engaging in or participating in the BxB Professionals Launch Party scheduled for February 1, 2024 at the Sonoma Grill located inside the Holiday Inn at 1730 N. Ocean Avenue, Holtsville, NY 11742.

**IT IS FURTHER ORDERED** that this Temporary Restraining Order shall remain in full force and effect until such time as a hearing may be held on Plaintiff's Motion for Preliminary Injunction, but in no event shall it remain in effect for longer than fourteen (14) days from the date of this order, unless stipulated by the parties or ordered by the Court.

**IT IS FURTHER ORDERED** that any violation of this order shall be treated as a contempt of Court.

**IT IS FURTHER ORDERED** that this Order shall continue in full force and effect until the hearing on the preliminary injunction sought in this matter, which will be scheduled for **February 14, 2024 at 1:00pm** (3 hours allowed).

**IT IS FURTHER ORDERED** that Defendants and their counsel may appear at the February 14, 2024 hearing via Zoom.

**IT IS FURTHER ORDERED** that the Court has exercised its discretion to determine that no bond shall be required and that this Order shall be effective immediately.

Dated this 1st day of February, 2024.

_____
Honorable Susan M. Brnovich
United States District Judge