**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LeTip World Franchise LLC, | No. CV-24-00165-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Long Island Social Media Group LLC, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff's request for a Preliminary Injunction (Doc. 7), which follows the Court's prior hearing and entry of a Temporary Restraining Order ("TRO"). (Doc. 21.) After entry of the TRO, Defendant filed a response opposing the Preliminary Injunction (Doc. 23), to which Plaintiffs replied (Doc. 24). On February 14, 2024, the Court held a Preliminary Injunction hearing. Due to the length of testimony, the Court allowed for additional time and completed the hearing on February 22, 2024. After the hearing, the parties each submitted proposed findings of fact and conclusions of law. (Doc. 47; Doc. 48.) The Court has now considered the pleadings, testimony, exhibits from the hearing, relevant case law, and arguments of counsel and will grant the Preliminary Injunction.

## I.    FACTS

LeTip is a privately-owned business leads organization. (Doc. 7 at 2.) The organization is made up of thousands of members who engage in professional development and networking with one another. (*Id.*) LeTip is divided into regional chapters. (*Id.*) There are currently over 250 chapters throughout the United States and Canada. (*Id.*)

LeTip has developed proprietary system for the development and operation of these chapters. (*Id.* at 3.) Through their franchising entity, LeTip World Franchise, LLC, LeTip franchises this system. (*Id.*) Their franchisees establish and administer the system within a defined territory. (*Id.*) The franchisees are then permitted to established chapters within its assigned territory, sell memberships to those chapters, and host membership meetings. (*Id.*) Summer Middleton is the current owner and president of LeTip. (Hearing Day 1 at 7:16–24.)

### A. The Agreements

On April 10, 2020, LeTip and Long Island Social Media Group ("LISMG") entered into one of the aforementioned franchise agreements (the "Franchise Agreement"). (*Id.*) Per this agreement, LISMG was granted the right to operate a LeTip business within Suffolk County, New York for five years. (*Id.*) LISMG is comprised of Clifford Pfleger, Heather Plfleger (the "Pfleger Defendants"), and Saranto Calamas. (*Id.* at 4.) Additionally, LISMG is a limited liability company organized under the laws of the State of New York, with its principal place of business also in New York. (Doc. 1 at 2.)

To identify the source, origin, and sponsorship of LeTip and distinguish its events, LeTip and its franchisees use certain trademarks, service marks, trade names, logos, emblems, and indicia or origin (the "LeTip Marks"). (Doc. 7 at 3.) LeTip retains the exclusive right to use and license the LeTip Marks. (*Id.*) The Franchise Agreement grants LISMG a limited, non-exclusive and revocable license to use the LeTip Marks. (*Id.* at 4.) This license also extended to LeTip manuals, training, and other confidential and proprietary information in connection with the operation of LISMG's territory. (*Id.*) Use of these marks is also governed by the LeTip Identity Guidelines. (*See* Ex. 27; Doc. 47-3 at 8–24).

Section 12 of the Franchise Agreement sets forth the operating standards for franchisees such as LISMG. (*Id.*) This section requires franchisees and owners to operate their LeTip business "in a manner that will promote the goodwill of the Marks" and remain in compliance with all standards and terms of the "Agreement and the Manual." (Doc. 1-

1 at 11.)  In full, Section 12.10 states:

> **Failure to Comply with Standards**. You acknowledge the importance of every one of our standards and operating procedures to the reputation and integrity of the System and the goodwill associated with the Marks. If we notify you of a failure to comply with our standards or operating procedures and you fail to correct the non-compliance within the period of time that we require, then, in addition to any other remedies available to us under this Agreement, we may impose a fine of up to $500 per violation for every 30 days that the violation remains uncured.

(*Id.*)

The Franchise Agreement also includes a provision governing the ownership and use of LeTip's intellectual property, found at Section 19.1.  This section provides:

> **Ownership and Use of Intellectual Property**. You acknowledge that: (i) we are the sole and exclusive owner of the Intellectual Property and the goodwill associated with the Marks; (ii) your right to use the Intellectual Property is derived solely from this Agreement; and (iii) your right to use the Intellectual Property is limited to a license granted by us to operate your Business during the Term pursuant to, and only in compliance with, this Agreement, the Manual, and all applicable standards, specifications and operating procedures that we prescribe from time to time. You may not use any of the Intellectual Property in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized by us. Any unauthorized use of the Intellectual Property constitutes an infringement of our rights. You agree to comply with all provisions of the Manual governing your use of the Intellectual Property. This Agreement does not confer to you any goodwill, title or interest in any of the Intellectual Property.

(Doc. 1-1 at 16.)

Section 19.3 also limited LISMG's and the Pfleger Defendants' use of the LeTip Marks.  It reads, in pertinent part:

> **Use of Marks**. You agree to use the Marks as the sole identification of your Business; provided, however that you must identify yourself as the independent owner of your Business in the manner that we prescribe. You

may not use any Marks in any modified form or as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs or symbols (other than logos licensed to you by this Agreement). The Franchise Agreement also contains several non-compete provisions.

(*Id.*)

Relatedly, LeTip requires approval of franchisee advertising. Section 11.3(c) reads:

**Approval of Advertising**. Before you use them, we must approval all advertising and promotional materials that we did not prepare or previously approve (including materials that we prepared or approved and you modify). We will be deemed to have disapproved the materials if we fail to issue our approval within two (2) business days after receipt. You may not use any advertising or promotional materials that we have disapproved (including materials that we previously approved and later disapprove). You do not need our pre-approval of your social media posts provided that they comply with our social media policy. However, you must immediately remove any posts that we disapprove of.

(*Id.* at 10.)

Section 22.2 provides for termination of the Franchise Agreement of these grounds, stating:

**Termination By Us Without Cure Period**. We may, in our sole discretion, terminate this Agreement upon five (5) days' written notice, without opportunity to cure, for any of the following reasons, all of which constitute material events of default under this Agreement:

(viii) *if you or an Owner commits an act that can reasonably be expected to adversely affect the reputation of the System or the goodwill with the Marks;*

(xiv) *if you make an unauthorized use of the Intellectual Property*

(*Id.* at 19–20.)

The Franchise Agreement also contains a provision that does not allow a franchisee to operate a competitive business during or for a period of two years following termination of the agreement. Section 16.4 states:

**Unfair Competition After Term**. During the Post-Term Restricted Period, you and your Owners agree not to engage in any Prohibited Activities.

Notwithstanding the foregoing, you and your Owners may have an interest in a Competitive Business during the Post-Term Restricted Period as long as the Competitive Business is not located within, and does not hold meetings for members or business owners from any venue that is located within, the Restricted Territory. If you or an Owner engages in a Prohibited Activity during the Post-Term Restricted Period (other than having an interest in a Competitive Business that is permitted under this Section), then the Post-Term Restricted Period applicable to you or the non-compliant Owner, as applicable, shall be extended by the period of time during which you or the non-compliant Owner, as applicable, engaged in the Prohibited Activity.

(*Id.* at 13.)

Attachment A of the Franchise Agreement defines the terms relevant to reading Section 16.4:

a. "***Post-Term Restricted Period***" means: "a period of two (2) years after the termination, expiration or Transfer of this Agreement; provided, however, that if a court of competent jurisdiction determines that the two-year Post-Term Restricted Period is too long to be enforceable, then the "Post-Term Restricted Period" means, with respect to you, a period of one (1) year after the termination, expiration or Transfer of this Agreement. "Post-Term Restricted Period" means, with respect to an Owner, a period of two (2) years after the earlier to occur of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the Entity that is the franchisee, as applicable; provided, however, that if a court of competent jurisdiction determines that the two-year Post-Term Restricted Period is too long to be enforceable, then the "Post-Term Restricted Period" means, with respect to an Owner, a period of one (1) year after the earlier to occur of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the Entity that is the franchisee, as applicable.

b. "***Competitive Business***" means any business competitive with us (or competitive with any of our affiliates or our franchisees) that focuses on the facilitiation of the exchange of business leads between members or other participants.

c. "***Restricted Territory***" means the geographic area within: (i) your Territory; and (ii) any territory operated by us, an affiliate of ours, or another franchisee as part of a LeTip business as of the Effective Date and that remains in operation or under construction during all or any part

of the Post-Term Restricted Period; provided, however, that if a court of competent jurisdiction determines that the foregoing Restricted Territory is too broad to be enforceable, then the "Restricted Territory" means the geographic area within your Territory.

(*Id.* at 26–28.)

Per Section 16.4, LISMG specifically agreed to not "hold meetings for member or business owners from any venue that is located within the Restricted Territory" and agreed to the Restricted Territory pictured below:



(*Id.* at 29–30.)  Concurrent with LeTip and LISMG's signing of the Franchise Agreement, Plaintiff, the Pfleger Defendants also executed a Franchise Owner Agreement.  (Doc. 7 at 7.)  Plaintiff asserts that this agreement personally bound the Pfleger Defendants to the Brand Protection Covenants in the Franchise Agreement, such as the post-termination restrictive covenant of Section 16.4.

The Franchise Owner Agreement also contains substantially the same post-termination restrictive covenant included in the Franchise Agreement.  (*Id.*)  The post-termination restrictive covenant in the Franchise Owner Agreement reads:

**<u>Unfair Competition After Relationship</u>**. You agree not to unfairly compete with us during the Restricted Period by engaging in any Prohibited Activities; provided, however, that the Prohibited Activity relating to having an interest

in a Competitive Business will only apply with respect to a Competitive Business that is located within, or holds meetings for members or business owners from any venue that is located within, the Restricted Territory. If you engage in any Prohibited Activities during the Restricted Period, then you agree that your Restricted Period will be extended by the period of time during which you were engaging in the prohibited activity.

(Doc. 1-1 at 33.)  The Franchise Owner Agreement defines "Restricted Period" as follows:

" . . . the two (2) year period after the earliest to occur of the following: (i) the termination or expiration of the Franchise Agreement; (ii) the date on which Franchisee assigns the Franchise Agreement to another person with respect to whom neither you nor your spouse holds any direct or indirect ownership interest; or (iii) the date on which you cease to be an owner of Franchisee or your spouse ceases to be an owner of Franchisee, as applicable; provided however, that if a court of competent jurisdiction determines that this period of time is too long to be enforceable, then the "Restricted Period" means the one (1) year period after the earliest to occur of the following: (i) the termination or expiration of the Franchise Agreement; (ii) the date on which Franchisee assigns the Franchise Agreement to another person with respect to whom neither you nor your spouse holds any direct or indirect ownership interest; or (iii) the date on which you cease to be an owner of Franchisee or your spouse ceases to be an owner of Franchisee, as applicable.

(*Id.* at 32.)  The Franchise Owner Agreement defines "Prohibited Activities" as follows:

(i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in a Competitive Business (other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business); (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); and/or (iii) inducing any LeTip member of ours, our affiliate or of another franchisee to transfer their business to you or to any other person that is not then a franchisee of ours.

(*Id.*)

Moreover, the Franchise Owner Agreement also defines a "Competitive Business" as "any business competitive with us (or competitive with any of our affiliates or our franchisees) that focuses on the facilitation of the exchange of business leads between

- 7 -

members or other participants." (*Id.*)  With respect to disputes, Section 24 of the Franchise Agreement contains a forum selection clause, as follows:

> The parties agree to submit any claim, dispute or disagreement, including any matter pertaining to the validity, enforcement or interpretation of this Agreement or issues relating to the offer and sale of the franchise or the relationship between the parties (a "Dispute") to mediation before a mutually- agreeable mediator prior to litigation, unless the Dispute involves an alleged breach of Section 16 or Section 19. Any mediation shall take place in the county in which we maintain our principal place of business at the time the mediation begins (currently, Maricopa County, Arizona). If the Dispute is not successfully resolved by mediation within 30 days after either party makes a demand for mediation or the Dispute involves an alleged breach of Section 16 or Section 19, either party may file a lawsuit in any state or federal court of general jurisdiction in the county in which we maintain our principal place of business at the time the lawsuit is filed and we and you irrevocably submit to the jurisdiction of such courts and waive any objection either of us may have to either the jurisdiction or venue of such courts.

(*Id.* at 21.)  Plaintiff states that they brought these claims in this Court in accordance with this clause. (Doc. 1 at 2–3.)  An amendment to the Franchise Agreement signed by LISMG on April 10, 2020 also contains a clause limiting modification of the Franchise Agreement, stating:

> <u>Modification</u>. This Amendment and the Franchise Agreement when executed constitute the entire agreement and understanding between the Parties with respect to the subject matter contained herein and therein. Any and all prior agreements and understandings between the Parties and relating to the subject matter contained in this Amendment and the Franchise Agreement, whether written or verbal, other than as contained within the executed Amendment and Franchise Agreement, are void and have no force or effect. In order to be binding between the Parties, any subsequent modifications must be in writing signed by the Parties.

(Doc 1-1 at 48.)  And lastly, the Franchise Agreement includes language regarding any asserted waiver of rights available to LeTip:

> We and you shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including the right to demand exact

compliance with every term, condition and covenant in this Agreement or to declare any breach of this Agreement to be a default and to terminate the franchise before the expiration of its term) by virtue of: (i) any custom or practice of the parties at variance with the terms of this Agreement; (ii) any failure, refusal or neglect of us or you to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations under this Agreement, including any mandatory specification, standard, or operating procedure; (iii) any waiver, forbearance, delay, failure or omission by us to exercise any right, power or option, whether of the same, similar or different nature, relating to other LeTip franchisees; or (iv) the acceptance by us of any payments due from you after breach of this Agreement.

(*Id.* at 22–23.)  All LeTip chapters were also bound to follow the LeTip Identity Guidelines. (*See* Doc. 47-3 at 9–24.)  These guidelines ask require chapters to "first submit any LeTip branded artwork to LeTip International, Inc. for approval. This is to ensure and create a consistent brand image and perception of LeTip no matter where the identity is seen." (Ex. 27; Doc. 47-3 at 11.)  The guidelines also provide specific guidance regarding unauthorized use of the LeTip logos, stating that members "may not use an image showing an authentic LeTip logo or other variation of the LeTip logo for any purpose." (*Id.* at 22.)  Lastly, the guidelines prohibit the use of "identical or virtually identical LeTip trademark as a second level domain name" and provides examples of prohibited domain names, such as "LeTipNewsletters.com," "LeTipNewYork.com," and "NJLeTip.com." (*Id.*)  Pfleger testified that he was aware of the post-termination restrictive covenants, and that he did not recall ever reviewing the LeTip Identity Guidelines but did not have reason to dispute they were made available to all LeTip Chapters.  (*See* Hearing Day 1 at 14:22–25; Hearing Day 2 at 30:1–33:18.)

**B.  The Conduct**

In April 2023, LeTip discovered that Clifford Pfleger had affixed a LeTip logo to his boat.  (Doc. 7 at 8.)  However, he modified the mark by adding the word "just" directly above LeTip.  (*Id.*)  Plaintiff alleges that this "resulted in a phrase deliberately infused with vulgar and sexual innuendo."  (*Id.*)  Pfleger also posted a picture of the boat with the modified mark on social media.  (Doc. 7-1 at 3–4 ¶ 17.)  More importantly, Plaintiff alleges

that this use of the LeTip Mark breached the Franchise Agreement, the license to use the LeTip Marks, and the "LeTip Identity Guidelines" given to all franchisees and chapters. (Doc. 7 at 8.)  Plaintiff contends that by modifying the LeTip Mark (the "modified logo") in this manner, Pfleger "negatively affected the goodwill associated with the marks."  (*Id.*) The boat can be seen in the image below:



Pfleger testified that he purchased the boat in April 2020 and placed the modified logo on the boat in August 2021.  (Hearing Day 1 at 104:9–22.)  He also conceded that he did not seek formal approval of the modified logo before placing it on his boat.  (Hearing Day 2 at 83:1–15.)  However, once placing the modified logo on the boat, Pfleger sent two pictures of the boat to John Pokorney, who at the time was the Chief Financial Officer ("CFO") of LeTip.  (*Id.* at 38:3–6.)  These messages, found in Exhibit 51, read as follows:

> Mr. Pokorney: Is that Real?
> Mr. Pfleger: Why? Do I need to exercise my 5th amendment right? Lol.
> Mr. Pokorney: Why? You have a license to use the logo, although if I were the IP police I'd have to say words aren't suppose to go over the logo. Looks great.
> Mr. Pfleger: Lol! Yes, it's real and it gets a lot of attention. It's a great marketing tool for me!!
> Mr. Pokorney: Fun.

1

2   (*See* Ex. 51; Doc. 47-3 at 26–28.)   In her testimony, Middleton asserted that

3   Pokorney was not authorized to grant Pfleger permission to use the modified LeTip logo

4   and did not own any rights to LeTip intellectual property. (Hearing Day 1 at 24:11–13; 66

5   18–25; 86:12–18.)   Pfleger testified that he took these messages to mean that he had

6   permission to use the modified logo.   (Hearing Day 2 at 38:3–6.)   Additionally, Pfleger

7   testified that LISMG registered the domain name "justletip.com" although he pronounced

8   it by emphasizing the "justle" portion of the name.   (*Id.* at 37:16–38:1.)   For clarity, the

9   Court had Pfleger spell out the domain name on the record.   (*Id.*)

10   Middleton testified that LeTip discovered the use of the modified logo on Pfleger's

11   boat through a Facebook post by Pfleger.   (Hearing Day 1 at 18:11–23.)   Middleton and

12   Paul Della Valle, Vice President of LeTip, met with Pfleger and demanded that he remove

13   the modified logo from his boat and delete all images of the boat with the logo from his

14   social media pages.   (Doc. 7 at 8.)   Middleton also gave Pfleger a letter from LeTip's

15   trademark counsel, which also demanded that he cease and desist publishing photographs

16   of the boat on social media.   (*Id.* at 8–9; Doc. 1-2.)   The letter also threatened legal action

17   and termination of the Franchise Agreement.   (Doc. 7 at 8–9.)   In short, Plaintiff contends

18   that the use of the modified logo breached the Franchise Agreement, the license to use the

19   LeTip marks, and certain "LeTip Identity Guidelines" given to all franchisees and chapters.

20   (*Id.* at 8.)

21   In response to the meeting and the letter, Pfleger verbally agreed to remove the

22   image from the boat.   (*Id.* at 9.)   However, Pfleger testified that Middleton orally informed

23   him that he had "30 business days" to remove the modified logo from his boat once he told

24   her that he would need time to remove it.   (Hearing Day 2 at 45:17–46:3.)   Middleton

25   disputed this in her testimony, stating that she never provided any time frame other than

26   what was outlined in the letter and told him to immediately remove the modified logo from

27   the boat and remove the images from his social media pages.   (Hearing Day 1 at 23:1–

28   24:10.)

In response, Middleton testified that Pfleger removed pictures of the boat with the modified logo from his social media pages that same day and sent text her text messages confirming that he did so.  However, Pfleger did not remove the modified logo from the boat.  (*Id.*)  Middleton testified that they visited the marina where Pfleger's boat was stored on June 2, 2023 and saw the boat with the modified logo still on it.  In a sworn declaration, Della Valle stated that he visited the marina again on June 7, 2023 and again saw that the modified logo was still on the boat.  Pfleger testified that he had difficulties scheduling his decal provider to come take the modified logo off the boat.  (Hearing Day 2 at 51:25–52:14.)  LeTip's counsel then sent LISMG a letter providing notice of their termination of the Franchise Agreement pursuant to Section 22.2 without an opportunity to cure.  (Doc. 1-3 at 1–5.)  Upon receiving this notice, Pfleger called Middleton and said he would "scrape [the logo] off with a razor," which he did.  (Hearing Day 2 at 51:16–52:14.)

Sometime in December 2023 or January 2024, Pfleger announced on LinkedIn that he was starting a new position as a Regional Director at BxB Professionals LLC ("BxB").  (Doc. 7 at 10.)  BxB holds it itself out as business networking company that aims to "connect like-minded business individuals with the purpose of sharing success, through business leads and networking.  Which will enable these individuals to grow personally, professionally, and profitably." (*Id.* at 11.)  BxB's registered corporate address is allegedly the same address listed for LISMG and is also the address Defendant Calamas lists for his CPA license.  (*Id.*)  Pfleger also testified that in or about mid-February 2024, BxB changed its business address to a "home office" located inside a house in Nassau County, New York.  (Hearing Day 2 at 9:17–25, 54:11–24.)

Pfleger had planned to hold a "launch party" for BxB on February 1, 2024, at the Sonoma Grill located in a Holiday Inn in Holtsville, New York.  (*Id.*)  This is the same venue where LeTip's Suffolk County chapters hold their monthly meetings on the first Friday of every month.  (Doc. 7-1 at 8; Hearing Day 1 at 96:20–22.)  Upon entry of the TRO, BxB canceled the launch party.  (Hearing Day 1 at 56:13–15.)  However, as shown during the preliminary injunction hearing, the videos announcing Pfleger's new role at BxB

and referencing the launch party remained "live" on social media after entry of the TRO. (*Id.* at 56:19–23; Doc. 34.)

## II.   LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action.  Fed. R. Civ. P. 65.  The analysis for granting a TRO is "substantially identical" to that for a preliminary injunction.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001); *Cochran v. Rollins*, No. CV 07-1714-PHX-MHM (JRI), 2008 WL 3891578, at *1 (D. Ariz. Aug. 20, 2008).  "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted))); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A plaintiff seeking a preliminary injunction must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm without an injunction; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.

## III.   DISCUSSION

### A.   Likelihood of Success on the Merits

In their briefing and through testimony at the preliminary injunction hearing,

Defendants assert that LeTip's termination of the Franchise Agreement was improper, and therefore Plaintiff cannot succeed on the merits.  (*See* Doc. 23-1.)

First, Defendants argue that LeTip allegedly breached the Franchise Agreement by "impermissibly competing with [LISMG] by taking LeTip members from Chapters in [LISMG's] franchise, transferring them to a chapter outside [LISMG's] franchise, and thereby depriving [LISMG] from the revenue of those members." (*Id.* at 2.)  Essentially, Defendants argue that it was LeTip, not Defendants, that breached the Franchise Agreement and is unfairly competing with Defendants.  (*Id.* at 4–5.)

However, outside of Pfleger's affidavit and minimal argumentation in the briefing, Defendants have not provided any evidence to support their claim that LeTip impermissibly competed with LISMG.  Notably, Defendants did not even include the LeTip bylaws they allege Plaintiff violated.  Additionally, Defendants have not shown how any of this alleged behavior would relieve them of their own contractual obligations with LeTip.

Further, at the preliminary injunction hearing, Pfleger testified that Secure Operations Monitoring Services, Inc. ("Secure Operations"), Pfleger's alarm company, was removed from its company seat in the LeTip Port Jefferson chapter, which deprived the company of significant revenue in violation of LeTip bylaws.  (Hearing Day 1 at 12:7–13 19).  Based on Defendants' briefing, this appears to form the basis of Defendants' lawsuit against LeTip in the Eastern District of New York.  (*See* Doc. 23-2.)  Specifically, that complaint alleges that LeTip "breached the Franchise Agreement with [LISMG] by, among other things, starting a new chapter, formed with existing members of LeTip [] Chapters in Suffolk County, which new Chapter was under LeTip['s] ownership and control, not under [LISMG]'s ownership and control, and LeTip [] did so on or about January 2023." (Doc. 23-2 at 16 ¶ 72.)  However, these arguments regarding Secure Operations are irrelevant.  Secure Operations is not a party to this case and is not a signatory to the Franchise Agreement.  The Court focuses solely on the allegations and parties before it.

Second, Defendants assert that LeTip, through Pokorney, granted LISMG permission to alter the LeTip logo and place it on his boat and therefore Plaintiff had no basis to terminate the Franchise Agreement. Plfeger testified regarding these text messages and stated that he considered Pokorney's responses to constitute permission. (Hearing Day 2 at 38:3–6.) The Court finds that Pokorney's texts did not convey the requisite authorization. At best, the texts merely indicate that he would turn a blind eye to the use of modified logo. Moreover, the modified logo is directly violates the LeTip Identity Guidelines. Although Pfleger testified that he did not recall reviewing these guidelines (Hearing Day 2 at 32:18–33:23), they were published to all LeTip members as of June 2021, when he was a member. Most crucially, these texts did not constitute a writing signed by both parties, as required by modification clause of the Franchise Agreement. (Doc. 1-1 at 48.) Additionally, Defendants' argument overlooks the fact that any alleged permission to use a modified logo may be rescinded per the Franchise Agreement, and that the modification of the logo and the registration of the domain name violated the LeTip Identity Guidelines. (Doc. 1-1 at 10.) When Middleton became aware of the modified logo and demanded it be removed, she was within her rights of the terms of the Franchise Agreement.

Lastly, Defendants argue that termination of the Franchise Agreement was improper because Pfleger immediately removed pictures of the boat from social media and removed the modified logo from the boat within thirty business days. The term of "thirty business days" was contested by the parties. As mentioned, Pfleger testified that Middleton told him he could have thirty business days to remove the modified logo from his boat, while Middleton testified that she demanded the modified logo's immediate removal. (Hearing Day 1 at 23:1–24:10.) The letter from LeTip's counsel also demanded immediate removal. (Doc. 1-2 at 2–3.) Defendants have not provided any documentary evidence supporting the "thirty business days" removal period. Therefore, the Court finds that the letter's language controls and was an acceptable demand under the Franchise Agreement.

For these reasons, Plaintiff has shown likely success in claiming that they were

within their rights to terminate the Franchise Agreement. Having disposed of these arguments, the Court turns to the post-termination covenants' enforceability. Plaintiff argues that these covenants are narrowly tailored and enforceable. (Doc. 7 at 13.) Plaintiff further argues that these restrictive covenants were designed to prevent Defendants' precise behavior and are consistent with protecting the company's legitimate interest in shielding its customer base from unfair competition and protecting trade secrets and confidential information. (*Id.*)

To be valid and enforceable under Arizona law, a post-termination restrictive covenant must: (1) be reasonable as to time and territory limitations; (2) not exceed what is reasonably necessary to protect the principal's legitimate business interests; (3) not unreasonably restrict the agent's rights; and (4) not contravene public policy. *Bed Mart, Inc. v. Kelley*, 45 P.3d 1219, 1221 (Ariz. Ct. App. 2002) (cleaned up); *Snelling & Snelling, Inc. v. Dupay Enters., Inc.*, 609 P.2d 1062, 1064–65 (Ariz. Ct. App. 1980). Whether a restrictive covenant is reasonable is a question of law. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1280–81 (Ariz. 1999). "The burden is on the party wishing to enforce the covenant to demonstrate that the restraint is no greater than necessary to protect the employer's legitimate interest." *Id.* at 1286. Moreover, territorial restrictions should be limited to the territory in which the franchisor has established customer contacts and good will. *Snelling*, 609 P.2d at 1064.

Here, Plaintiff's restrictive covenants provide both duration and geographic limitations. (Doc. 1-1 at 13, 26–28.) Under the Franchise Agreement, Defendants are restricted from operating a competitive business during or for a period of two years following the agreement's termination. (*Id.*) This restriction, at a minimum, extends to Defendants' LeTip territory, Suffolk County, New York, also referred to as "the Restricted Territory." (*Id.* at 29–30.) Arizona courts have addressed the reasonability of both types of restrictions. For instance, in *Snelling*, an Arizona court upheld a covenant not to compete within thirty-five miles of a designated franchise area for three years. 609 P.2d at 1064–65. The court further found the restriction necessary to protect the goodwill of the

franchisor's trademark within the franchise area.  *See id.*  The court, however, found that a different restriction prohibiting a party from establishing a business within thirty-five miles of *any* Snelling office was unreasonable.  *Id.* at 1064.

A court in this District reached a similar conclusion in *Fitness Together Franchise Corporation v. C.P. Body Design, Inc.*, No. CIV-09-02230-MHM, 2010 WL 11628010 (D. Ariz. Feb. 24, 2010).  There, the court upheld a one-year restriction within an eight-mile area for a fitness franchisee.  *Id.* at *8.  The court reasoned that the restriction was narrowly tailored and balanced the franchisor's protectable interest in its customers and good will within the restricted area.  *Id.*  Further, in *First Ascent Ventures, Inc. v. DLC Dermacare, LLC*, No. CV-06-1794-PHX-JAT, 2006 WL 7285609 (D. Ariz. Oct. 25, 2006), the court upheld a restrictive covenant that prohibited franchisees from having an interest in a competitive business for three years after termination of the franchise agreement if the business was located either within a franchise area or within 30 miles of another clinic within the franchise.  *Id.* at *6.  The court based its decision on the loss of good will, inability to establish a new franchise without competition from the new business, the loss of customer base, and intangible damage to the franchise system.  *Id.*

Applying these cases to the similar facts here, the Court finds the post-termination restrictive covenants are reasonable.  Both the time and geographic limitations fall within the bounds of reasonability under Arizona law.  First, two years is a sufficiently narrow window of time to protect Plaintiff's good will and customer relations within the Restricted Territory without impermissibly restraining Defendants' ability to pursue a new business venture.  The two-year temporal limitation is reasonable given that recruiting new members to such networks can take weeks or months, and developing the networks of members can take years.  (Hearing Day 2 at 36:14–37:5.)  Moreover, this restriction properly serves to protect Plaintiff's interest in retaining customers likely sought out by both parties— business professionals who are interested in professional networking events.  Moreover, given Pfleger's income from other sources, including Secure Operations and his minority ownership in a gun shop, this temporal restriction does not unreasonably interfere with his

ability to earn a living.  (Hearing Day 2 at 26:14–28:13; 28:15–29:24.)

The same analysis applies to the geographic restriction.  Again, the geographic restriction falls within the reasonability standards outlined in prior cases.  Additionally, the restriction plainly serves to protect Plaintiff's established relationship with existing customers within the Restricted Territory.  Plaintiff has customer contacts and good will in the Restricted Territory that it reasonably wishes to protect.  Moreover, this covenant is properly restricted to the Restricted Territory.  The Restricted Territory is a sufficiently small area that is directly tied to Defendants' former (and potentially current) business operations and, in turn, tied to Plaintiff's business.  However, like the court in *Snelling*, this Court also finds that extending this restriction to *any* other territories would be unreasonable.  *See Snelling*, 609 P.2d at 1064.  However, at the TRO hearing, counsel for both parties agreed that the covenant will apply only to the Restricted Territory.  This is also reflected in the current briefing.  (*See* Doc. 47 at 22–23; Doc. 48 at 1–2.)  Accordingly, the Court finds both post-termination covenants reasonable.

In its Complaint, Plaintiff also alleges a claim for breach of contract and tortious interference with contractual relations.  Under Arizona law, a claim for breach of contract has three elements: (1) the existence of a contract between the plaintiff and defendant; (2) a breach of the contract by defendant; and (3) resulting damage to the plaintiff.  *Frank Lloyd Wright Found. v. Kroeter*, 697 F. Supp. 2d 1118, 1125 (D. Ariz. 2010).  Here, Plaintiff alleges that Defendants are breaching the Franchise Agreement and the Franchise Owner Agreement by directly competing against LeTip.  (Doc. 1 at 11.)  On the current record, Plaintiff has still established these elements to a degree to show likelihood of success on the merits of the claim.  In short, the Court's analysis from the TRO applies to this claim and is fully incorporated here.

The same is true for the tortious interference claim.  To establish this tort, a claimant must show: (1) a valid contract or business expectancy existed; (2) the interferer had knowledge of such business contracts or expectancy; (3) there was intentional interference causing a breach of the contract or business expectancy; and (4) resultant damages.

*Neonatology Assocs. v. Phx. Perinatal Assocs. Inc.*, 164 P.3d 691, 693 (Ariz. Ct. App. 2007).  This claim relates to Plaintiff's allegation that Defendants BxB and Calamas "are willfully and intentionally interfering with LeTip's business expectancies by causing LISMG and the Pfleger Defendants to breach the terms of the Franchise Agreement and the Franchise Owner Agreement."  (Doc. 1 at 12.)  Plaintiff also asserts that these Defendants are acting in a "spiteful manner that is intended to harm LeTip's reputation and goodwill" resulting in irreparable injury and damage to its "business practices, reputation, and relationships."  (*Id.*)  Like the breach of contract claim, Plaintiff has also established these elements at a level to show likelihood of success on the merits.  Again, the Court's analysis from the TRO applies to this claim and is also fully incorporated here.

In sum, the Court finds that both post-termination restrictive covenants are reasonable, and that Plaintiff has shown a likelihood of success on the merits on their claims.  The two-year period for the post-termination non-compete shall run from the date the Franchise Agreement was terminated.

**B. Irreparable Harm**

Next, Plaintiff asserts that the alleged contractual breaches have caused, and will continue to cause, irreparable harm to their business.  (Doc. 7 at 15.)  Plaintiff also indicates that Section 16.8 of the Franchise Agreement that any violation of the terms of that Section will entitle them to injunctive relief.  (*Id.*)  Defendants argue that money damages are sufficient for this injury.  (Doc. 48 at 4.)

Irreparable harm is harm for which there is no adequate remedy at law, such as money damages.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance.  Demonstrating irreparable harm is not an easy burden to fulfill."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (cleaned up); *see also Dalkita, Inc. v. Distilling Craft, LLC*, 356 F. Supp. 3d 1125, 1131 (D. Colo. 2018).  However, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of

irreparable harm." *Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841.

Here, Defendants' creation of a new business venture in the same geographic territory seeking the same customers as Plaintiff caused irreparable harm. As Pfleger's testimony showed, Defendants started a business intended to directly compete with LeTip, promoted the business, and scheduled a "launch party" to attract clients. Although Pfleger moved the headquarters of the business to Nassau County, his intent remains to create chapters "throughout the United States." (Hearing Day 2 at 69:20-70:11.) These actions are likely to cause Plaintiff to lose current and prospective customers and good will. Defendants' assertions that money damages can be calculated based on the number of members ignores this reality. The Court here is examining the loss of prospective customers or goodwill—elements that are difficult to quantify.

Additionally, in signing the Franchise Agreement, Defendants acknowledged that any breach of the covenants would cause irreparable harm, for which there is no adequate remedy at law. (*See* Doc. 1-1 at 14.) The only means of effectively enforcing the provisions is injunctive relief. *See Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006). However, given the analysis above, the Court reiterates that BxB may operate in Nassau County because the restriction is limited only to Suffolk County. In sum, the Court finds there is a likelihood of irreparable harm if a preliminary injunction is not issued.

### C. Balance of Equities

Next, Plaintiff argues that the balance of equities tips in their favor due to the limited harm Defendants would suffer if enjoined. (Doc. 7 at 16.) Defendants disagree and argue the balance tips in their favor. (Doc. 48 at 7.) "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("In assessing whether the plaintiffs have met this burden, the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'") (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.1980))).

The Court agrees with Plaintiff.  Here, Defendants may lose BxB revenue if enjoined.  However, this revenue would likely stem from violating the valid restrictive covenants.  Conversely, if BxB operates as Defendants' have planned, Plaintiff will suffer harm to its business and good will in the Restricted Territory.  Additionally, Defendants are not prohibited from running their business anywhere outside of Suffolk County.  Accordingly, the balance of equities weigh in favor of Plaintiff, and thereby in favor of granting the preliminary injunction.

### D. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  "Courts have held that the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights." *Compass Bank*, 430 F. Supp. 2d at 983.  Here, the public interest is served by enforcing the reasonable terms as written and agreed to by the parties.  Therefore, public policy also weighs in favor of granting the preliminary injunction.

## IV.   CONCLUSION

For the reasons discussed above,

**IT IS HEREBY ORDERED granting** Plaintiff's Motion for Preliminary Injunction (Doc. 7).

**IT IS HEREBY ORDERED** that for the pendency of this case, Defendants, their owners, employees, agents, and all those in active concert or participation with them, are hereby restrained and enjoined, directly and indirectly, from engaging in any of the following activities within the Restricted Territory: (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in any business defined as a "Competitive Business" in section 16.4 of the Franchise Agreement, (ii) diverting or attempting to divert any business from LeTip (or one of its affiliates or

franchisees); and (iii) inducing any LeTip member, affiliate or franchisee, to transfer their business to Defendants or to any other person or entity that is not a franchisee of LeTip, all within Defendants' former franchise territory, Suffolk County, New York.

**IT IS FURTHER ORDERED** that any violation of this Preliminary Injunction shall be treated as a contempt of Court.

Dated this 26th day of March, 2024.

Honorable Susan M. Brnovich
United States District Judge